[Civ. No. 3454.   Third Appellate District.—June 27, 1928.]

GEORGE WALTERS, Appellant, v. E. M. EVICK et al., Respondents; and LOTTIE BLANE, Appellant, v. E. M. EVICK et al., Respondents.

A. H. Carpenter for Appellants.

Cooley & Gallagher for Respondents.

HART, Acting P. J.—These are actions for damages for personal injuries alleged to have been sustained by the respective plaintiffs and appellants through the negligence of the defendants. The injuries to the two plaintiffs occurred at the same time under precisely the same circumstances and from the same alleged cause. At the opening of the trial, it was expressly stipulated by and between the respective parties that, inasmuch as the witnesses and the testimony would be the same, the two cases be consolidated and tried together before the same jury, and the court made an order in accordance with said stipulation.

The jury, by whom the cases were tried, found in favor of the defendants and against the plaintiffs, and upon the

verdict thus arrived at and returned, judgment was entered awarding the defendants the costs and disbursements incurred and made in each of the actions. The plaintiffs separately appeal from the judgment so entered, and support the same by a record made up in accord with the provisions of the so-called alternative method.

The points urged for a reversal are: Insufficiency of the evidence to support the verdicts, alleged misconduct on the part of counsel for the defendants during the course of the trial, which, it is claimed, prejudiced the jury against the plaintiffs, and error in giving and refusing to give certain instructions, the rejected instructions being proposed by the plaintiffs.

The defendant, as the complaint and the evidence show, was, at the time the plaintiffs received the injuries complained of herein, and had been, for some time prior thereto, maintaining and conducting in the city of Stockton a taxicab service for hire.

The injuries for which plaintiffs by their respective actions are suing for compensatory relief were caused by their being struck, knocked to the ground and dragged a considerable distance on and over the street in the city of Stockton on which the accident occurred by a taxicab of the defendant operated at the time by one Charles Johnson, an employee of the former. It appears that in the early evening or late afternoon of February 22, 1925, the plaintiffs attended, in the company of each other, a moving-picture show at one of the theaters in the city just named; that they left the theater together a few minutes after 8 o'clock P. M. of the day named, and, the night being "stormy" and dark—a heavy rain falling at the time—they boarded a street-car traveling east on Main Street, in said city, their destination being a candy-store, where the plaintiff Blane was then and had been employed for about nine years, and which store was located in the center of the block, on the north side of said street, between Grant and Aurora Streets; that, as the car was approaching the point of location of the candy-store, Miss Blane directed the motorman to stop the car so that she and her escort (plaintiff Walters) could leave the car; that, upon reaching a point a little east of and a short distance from the candy-store, the motorman stopped the car, that the plaintiffs thereupon, from the front end thereof,

stepped therefrom to the pavement and, Walters holding Miss Blane by the left arm, walked or ran to and around the rear end of the car and thence in the direction of the sidewalk on the north side of the street; that, on reaching the northwest corner of the car, they halted for a second, looked to the east to see if any vehicle was approaching from the east, and almost simultaneously with that act and their observance at the same time of the flash of the headlights of the taxicab traveling toward them, they were struck by the cab, with the general result as above stated, inflicting upon the persons of both plaintiffs severe injuries.

The complaints, with the usual particularity, describe the circumstances leading to and attending the accident as they are above briefly stated, and likewise describe the physical injuries which the respective plaintiffs sustained by reason thereof. The answers specifically deny the material facts alleged in the complaints, and, also, by way of a special defense, charge that the accident and its consequences were the direct result of the plaintiffs' own negligence—that is, that they were themselves guilty of negligence which contributed proximately to the accident and the personal injuries received by them as the result thereof.

A careful reading of the testimony can leave no room for a reasonable doubt that the verdicts are afforded abundant support by the evidence. The plaintiffs introduced as a witness in their behalf Charles Johnson, who, as above stated, was operating the cab at the time of the accident, and who testified that the weather was bad that night (referring to the time of the mishap); it was raining very hard, and the streets were very slippery; that about 8:33 that evening (Feb. 22, 1925) he was driving the cab "west on Main street, in Stockton," having a few minutes previously been at and started from the Stockton station of the Southern Pacific Company, said street running directly west from said station into the "heart" or business center of said city; that he "was running with two wheels of the cab just about in the middle of the west-bound track (that is, the north street-car track) and the other two just half way over the car track on the right-hand side of the car track." In other words, as he later explained, the cab was at the time "straddling" the north or right-hand rail of the north street-car track, so that the two left-hand wheels of the cab,

so Johnson in effect stated, were about halfway between the two rails of the north or "west-bound" street-car track. Being asked how he was able to describe the position of the cab as he was driving it along said track, the witness stated: "I am positive that I was in that position, because that is about the only position you can drive on Main street at that time of the evening. It is a narrow street, and there are always machines, more or less, parked along the curb. If I get over any further the other way I would be getting too close to the (street) car going in the other direction." Proceeding, on direct examination by plaintiff's counsel, the witness testified that he was traveling "about 15 miles an hour"; that he observed the street-car going east in "about the middle way of the block; it was moving slowly—just a little"; that he did not observe whether it was "just starting"; that he did not see the plaintiffs, or either of them, before the accident. He stated that the headlights on the cab "were lit"; that they (the headlights) would and did, on the occasion of the accident, reflect the distance usual with headlights of the average machine—"probably about twenty-five feet"; that he was able to see further ahead of him by the aid of the headlights than twenty-five feet, for the reason that while "the lights first hit the road about twenty-five feet, from there they scatter out," so that one "can generally see quite a distance further"; that "on that particular night I could see at least for two blocks." He stated that the first "I saw of the people (plaintiffs) was when they ran out from behind the street car in front of the car (the cab). . . . I was just past the end of the street car when they came out from behind it. . . . I will say that I was about two and a half or three feet from the street car, which was on my left" (at the time the collision occurred). The witness stated that the instant he saw the plaintiffs step in front of the cab he tried to stop the cab; that it was not an easy matter to stop the cab, because of the slippery condition of the street; that when he realized that he had struck the plaintiffs he succeeded in stopping the cab after it had gone about twenty feet; that he stopped it (giving his opinion) at a point "practically straight in the direction I was going"; that if he turned towards the curb at all, in trying to stop the cab, it was only "a few inches." The witness testified that the point where he stopped the

cab was about fifteen feet beyond and west of the candy-store. He said that when the cab was stopped Miss Blane's body "was just behind one of the front wheels, kind of diagonal across the front of the machine and behind the front wheel," or, in other words, "back of the front axle." The witness stated that plaintiff Walters, after the cab was stopped, was lying in the street a distance of about ten feet in front of the cab; that after lying on the street a very few minutes he arose to his feet and "staggered" about some, being in a dazed condition produced by his injuries. He appeared to be "groggy," as the witness expressed it, meaning, as the witness explained, that he (Walters) was in a more or less semi-conscious condition of mind. Miss Blane, so Johnson testified, was taken from underneath the cab by several of the persons that had gathered at the scene of the accident, they having lifted the cab from her body and removed her from the position under the cab into which her body had been thrown by the impact. Miss Blane was carried into the candy-store referred to above, from which, a few minutes later, both she and Walters were taken to the city emergency hospital and there given treatment.

T. E. Seaich, a merchant by occupation, testifying for the defendant, stated that on the night or evening the accident occurred, and at the time of the happening thereof, he was riding in his automobile and driving the same on Main Street, in Stockton, immediately back or west of the street-car concerned herein, and going in the same direction; that, in other words, he was following said street-car; that the street-car stopped "about the middle of the block between Grant and Aurora Streets; that, upon the stopping of the street-car, he saw the plaintiffs leave the car and proceed towards the rear end of the car "and run across the street right in front of the cab"; that, before the accident happened, he saw the taxicab traveling west, and, according to his opinion, at the rate of between twelve and fifteen miles an hour. The witness said that he first observed the taxicab when it was about ten feet from where the impact occurred; that the plaintiffs, on reaching the northwest corner of the street-car, hesitated an instant, and that it was then that they were struck by the cab; that as soon as the accident happened he drove his car to and parked it at the north curbing of Main Street, at a distance approximately of

twenty-five feet east of the candy-store; that the taxicab was stopped from thirty-five to fifty feet west of where he parked his car; that the point in the street-car track where the plaintiffs were struck by the cab was "right alongside" the candy-store. On cross-examination the witness said that in following the street-car he was driving at a rate of speed of about twelve or fifteen miles an hour—that he was driving "in low"; that he stopped when the street-car stopped; that he had driven an automobile long enough to be able to give a fair judgment as to the rate of speed at which an automobile is being driven. He further testified: "I threw out the gear with my foot and started to stop as soon as I seen them (plaintiffs) run out in front of the cab; as soon as I seen them run out behind the car, in front of the cab, I started to stop. I expected them to be hit as soon as I seen them run out." The witness stated that by saying that plaintiffs "hesitated" when they reached the northwest corner of the street-car he did not mean to say that they "stopped," but thereby meant to say that they (plaintiffs) "slowed up" a little; that they did not stop moving; that when he first observed the plaintiffs Walters was holding the arm of Miss Blane, and that their movement in going towards the rear end of the street-car was "just a dog trot." He further said that although the night was dark and a heavy rain was then falling, he could then, nevertheless, see a distance of twenty or thirty feet ahead of him as well as he could at any time.

E. M. Evick, one of the defendants, testified that on the night of the accident, at the emergency hospital in the city of Stockton, the plaintiff Walters, in a conversation with the witness, stated to the latter that the accident occurred through his (Walters') fault. Evick, on cross-examination, stated that at the time of said conversation Walters did not seem to be seriously hurt—he did not complain of any internal injury or of symptoms indicating such injury—and that mentally he appeared to be sound or not in any degree affected.

The above brief recital, in substance, of the testimony of the operator of the cab at the time of the accident and the testimony presented by the defense very clearly confirms the declaration made at the outset of this opinion that the verdicts stand upon a strong evidentiary foundation. From

that testimony the jury, believing it to be true, as presumptively they did, were justified in concluding, as impliedly they did conclude, that the plaintiffs stepped from the car to the pavement, that they thereupon, with Walters holding Miss Blane's left arm, proceeded hurriedly—if not running, walking faster than the usual gait—to the rear end of the car, and likewise started to cross the north railroad track, but, instantly observing the taxicab within a few feet of them—indeed, so near that neither they nor the driver of the cab could have done anything or adopted any course which would or could have averted a collision—they hesitated, or diminished the gait at which they went from the front to the rear end of the street-car, and, having already stepped into the path of the cab, were, while still moving, practically at the same instant of time struck by the front end of that vehicle. That the finding of these facts, with the further fact that the night was dark and the rain falling heavily, and, also, the fact that the street-car stopped in the center of the block—an unusual place for street-cars to stop to discharge passengers—amounted to a finding of contributory negligence on the part of the plaintiffs—negligence without which the accident would not have occurred—is not a debatable proposition. And when we turn to the testimony of the plaintiffs themselves, as well as the testimony of some of their witnesses, we find, upon a careful analysis thereof and its like comparison with that of the operator of the cab and defendant's witness, Seaich, that, substantially, it tends to support rather than to negative the theory of the defense that the plaintiffs were each guilty of negligence which proximately caused or contributed to the accident and its consequences. In the first place, it is to be remarked that it is very clear, from weather conditions, that the plaintiffs were bent on getting into the candy-store, and thus sheltering themselves from the storm, as hastily as possible. Walters testified that Miss Blane, just before the street-car reached the center of the street, or, what was the same thing, just before the car reached the point of location of the candy-store, spoke to the motorman of the car. Walters did not, so he declared, hear the remark made to the motorman by Miss Blane, but it transpired that almost immediately after the latter spoke to the motorman the car was stopped in the middle or center of the street and the

plaintiffs there permitted to leave the car. The jury were legally authorized to find, in the determination of the probative effect of the evidence, and all the various circumstances thereby disclosed, conspicuously significant among which was the fact that she was employed at the candy-store, that Miss Blane directed or requested the motorman to stop the car, for the convenience of herself and her companion, near where said store was located. Again, neither Walters nor Miss Blane had an umbrella with them at the time, nor, as she stated, was she wearing a hat on that occasion. The circumstances here adverted to added singularly strong support to the theory of the defendants that the plaintiffs, being more or less overwhelmed with anxiety to get into the candy-store as hastily as possible, proceeded, on leaving the car, with considerable alacrity to the rear end of the street-car, on reaching which they likewise proceeded to cross the north or "west-bound" street-car track to the sidewalk in front or within a few feet of the entrance to the candy-store. Moreover, the circumstances thus adverted to are more or less supported by the testimony of the plaintiffs' witness, Sharpstein, who stated that he witnessed the accident from an oil station situated about a block distant from the point at which the impact occurred, and that he had a "faint recollection" (the trial having taken place over a year after the accident)' that the street-car stopped in the center of the block, and that he saw the two passengers leave the car and run across, or attempt to cross, the street, when they were struck by the cab. Shown a written statement, signed by him a very short time after the happening of the accident, in which he stated that the street-car was stopped in the middle of the block and that he saw two persons leave the car and run across, or attempt to cross, the street, he was asked by counsel for the defendant whether his recollection was good at the time he made and subscribed his name to the statement, to which he replied in the affirmative, and further declared that the said statement contained a truthful narrative of the circumstances of the accident as he saw it. Furthermore, C. R. Smith, a witness for the plaintiffs, testified that the street-car stopped almost directly opposite the candy-store—that is, in the center of the block between Grant and Aurora Streets. As to the point in the street at which the street-car stopped,

Miss Blane herself stated that when the car stopped the rear end of the same was about on a line with the easterly boundary line of the candy-store building (Trans., p. 201), although it should be stated she elsewhere in her testimony declared that the street-car had passed the candy-store by about twenty feet before it stopped. And Walters testified (Trans., p. 250) that the point where the street-car stopped was about five or six feet east of the easterly line of the candy-store building.

It is true that the plaintiffs each denied that they ran from the front to the northwest corner of the street-car and also denied stepping in the space between the north and south rails of the "west-bound" track. Miss Blane testified that she walked at a "natural gait" to the rear end of the street-car and that when she and Walters reached a point a little over three feet from the northwest corner of said car and were in the space between the two tracks, that is, between the north rail of the south track and the south rail of the north track—they paused or stood still and looked east to see if any vehicle was approaching or traveling west. It was at this time, she stated, that she and Walters were struck by the cab, Walters then being a trifle behind or back of her. It is also true that the testimony of both the plaintiffs is widely different from that of Johnson and Seaich with respect to the distance the cab proceeded over the street from the time the collision occurred. The former testified that they were drawn or "dragged" by the cab for a distance of from fifty to seventy-five feet. The testimony of Johnson, operator of the cab (and, as seen, introduced by plaintiffs as their witness) and that of Seaich (defendants' witness) substantially harmonize (as shown above) to the effect that the distance the cab proceeded before it was stopped after striking the plaintiffs was about twenty or twenty-five feet; and, of course, the testimony of the latter as to that matter must be accepted by this court as involving the truth, since, as is to be assumed, the jury so accepted it. As to the rate of speed at which the cab was traveling when the accident occurred, it can hardly be said that a conflict in the evidence of a substantial character arose or exists, since, as already shown, Johnson and Seaich were in a better condition of mind to express an approximately correct opinion as to the rate of speed at which the

cab was being operated before and at the time of the accident than was either of the plaintiffs. The latter, as seen—or at least the jury were warranted in so finding—were struck almost simultaneously with their appearance beyond the northwest corner of the street-car. The suddenness of the perilous situation by which the plaintiffs were thus beset and the necessarily coincident perturbation of mind of the average person so circumstanced, would hardly justify acceptance of the proposition that they could have estimated, with a satisfactory degree of accuracy, the speed at which the cab was traveling before or at the time the accident occurred. Walters said that he judged, from the speed with which he was shoved along the street by the cab for the distance of the first foot from the point in the street where they were struck, that the cab was being driven at the rate of from thirty to thirty-five miles an hour. This testimony was probably given by the jury little, if any, weight upon the question of the rate of speed at which Johnson was then operating the car. And his (Walters') is the only testimony which in any way contradicts or purports to contradict the testimony of the witnesses Johnson and Seaich with regard to the rate of speed at which the cab was traveling before or at the time the plaintiffs were struck down. But it is not necessary further to review the testimony analytically or otherwise. It is perfectly clear that the jury were warranted in finding that the plaintiffs stepped directly in front of the cab immediately upon their passing around the northwest corner of the street-car. The position of Miss Blane's body under the cab—directly under the front axle and crank-case of the cab—and the position of Walters' body as it was dragged along the north track of the street-car, and the parts of their bodies injured, plainly indicate that they stepped in the pathway of the cab. All these matters were, of course, for the jury's determination, yet, as to the position of the plaintiffs with reference to the cab at the moment they were hit, the undisputed physical facts themselves clearly show that, when struck, they were directly in the pathway of the cab. But it may here well be suggested that even if, in point of fact, the driver of the cab, at the time of the accident, was driving on or over the two north tracks instead of straddling the north rail of said track, as he testified and as the jury impliedly found,

and it was also true that the street-car stopped at or near the intersection of Grant and Aurora Streets, instead of the center of the block between those streets, as a number of the witnesses, including several introduced by plaintiffs, testified, and that in so doing he was guilty of negligence in the absence of which the accident would not have occurred, it would also still be true that the admitted act of plaintiffs in going to the rear of the street-car, and attempting to cross the street, beyond the established foot crossing, before the street-car had passed on and thus a clear open view of the street to the east afforded them, was one of negligence which, manifestly, contributed as a proximate cause to their injuries for which, therefore, they would not be entitled to compensatory relief.

The misconduct assigned against the attorney for the defendants arose under the following circumstances: Each of the complaints as originally framed and filed alleged that the street-car stopped at the west line of the intersection of Main and Aurora Streets—east, by practically half a block, from the location of the candy-store—and that "as plaintiff stepped to the ground at the *rear* end of the street car, he (and 'she') was struck with great force and violence and felled to the ground, and drawn *thirty-five* feet along said Main street," etc. At the beginning of the trial counsel for plaintiffs asked for and was by the court given leave to amend the complaints by substituting for the word "thirty-five" the word "seventy-five," and also by substituting for the word "rear" the word "front." As so amended, each of the complaints in the respect here considered, reads as follows: That "as plaintiff stepped to the ground at the *front* end of said street car, he (and 'she') was struck with great force and violence and felled to the ground, and drawn *seventy-five* feet along said Main street," etc. Cross-examining the plaintiffs, counsel for the defendant asked each whether the indicated amendments of the complaints were suggested by counsel for plaintiffs. Each plaintiff denied that such was the fact, but the question so asked caused a bitter controversy between the respective counsel. The attorney for the plaintiffs, in objecting to the question, declared that thus it was unjustifiably insinuated that the plaintiffs were guilty of perjury and he (counsel) was guilty of suborning perjury. The attorney for defendants, ad-

dressing plaintiff's attorney, in effect retorted with the statement that he (counsel for defendants) was not the first one that had accused plaintiffs' counsel of subornation of perjury. Later and in the course of the cross-examination of Miss Blane, counsel for the defendants asked the witness if she had not, on direct examination, at first stated that she and Walters were a little over three feet from the northwest corner of the street-car when they paused to look and see whether a vehicle of any kind was approaching from the east, and then changed said statement in response to a suggestive question by her attorney so that she was then made to say that they were three feet from the north rail of the north track at the time referred to. This question brought an objection from the attorney for plaintiffs (not stating the grounds) and the following remarks: "That is insulting to me; that is insulting to the witness, and it is done for the purpose of prejudicing this plaintiff before the jury, and not only that, but it states a falsehood." To those remarks counsel for defendants replied: "It comes within— even for a man of counsel's stamp, to accuse anybody of falsehood, who is a suborner of perjury"—(here the judge interrupted by saying that there was no objection before the court for the court to rule on). In the same connection counsel for the defendants asked Miss Blane a question predicated upon the assumption that she, on direct examination, had testified that the point where she and Walters stopped after passing around the rear end of the street-car was "three feet from the northwest corner of the street car." Plaintiffs' counsel, in objecting to the question, declared: "He (counsel for defendants) is trying to falsify this witness' testimony." Counsel for defendants answered: "No jury ever found that I falsified any witness' testimony as they did you." In the course of his argument to the jury counsel for plaintiffs, among other things, said: "At the opening of this case I asked the court if it would permit me to make some modifications of the complaint. . . . I drew that complaint some months ago. . . . I drew it, as I supposed, in accordance with the facts of the case . . . as they were presented to me. I had no intention, ladies and gentlemen of the jury, to put into that complaint anything that was false or untrue. I never read that complaint after the time that I drew it until a day or two

before this case was called in this court. I read it to the plaintiff who sits there, and he called my attention to the fact that—'' (Here counsel for the defendants objected to the recital by counsel for plaintiffs of any conversation he might have had with his clients "which was not in testimony.") After some further remarks by counsel for plaintiffs, the court interrupted him, saying: "If you attempt to go outside of the record, of course that opens the door, to some extent, for a reply on the other side," to which counsel for plaintiffs replied: "If the court please, I welcome it. If there is anything that the gentleman can say that would tend to show that I intended to urge one single thing before this jury that was false or untrue, let him do it. I challenge him to do it"; whereupon the attorney for the defendants retorted: "I accept it." In addressing the jury, on the close of the opening argument by counsel for the plaintiffs, counsel for defendants introduced his argument by stating that, having been challenged by his antagonist to point to any occasion when the latter had been charged with "having done anything to stretch the imagination of any witness' testimony," he would call attention to the fact that counsel for the plaintiffs had once been accused and convicted, "in this very county," of the crime of subornation of perjury. Here defendants' counsel was interrupted by plaintiffs' counsel as follows: "There is no objection whatever to that statement, only I would like to have him tell the result, if he wants to." Mr. Gallagher, the counsel for defendants: "I will read the decision," referring to the opinion of the supreme court reversing the judgment of conviction against counsel for plaintiffs in said case. Counsel for plaintiffs: "I am asking for the conclusion." Mr. Gallagher: "I will read the decision, if you want." Counsel for plaintiffs: "All right, go ahead." Thereupon counsel for defendants proceeded to and did read the entire decision of the supreme court. The reading of the decision having been concluded by Mr. Gallagher, counsel for plaintiffs in effect asked the former to state to the jury what the final disposition of the case was after the reversal, and, no response by Mr. Gallagher to that request having been essayed, the counsel for plaintiffs denounced the former in bitter terms; but, in his closing argument to the jury, explained that, a short time after

the *remittitur* in the subornation of perjury case was received by the clerk of the San Joaquin County superior court, the indictment therein was dismissed on the motion of the district attorney of said county, counsel further stating that, on the dismissal of said indictment, the district attorney who prosecuted the case declared to him (counsel for plaintiffs) that there never existed any real grounds for the institution of the criminal action, and that he (the district attorney) very much regretted that he had permitted the prosecution of the case.

Of course, counsel for the defendants was within his legal rights when questioning, on cross-examination, Miss Blane and Walters regarding the reasons for amending the complaints, if, in good faith, he believed that said amendments were inspired or made with knowledge by the plaintiffs that the amendments were not based upon the real truth of the matter to which they related. ▉ An attorney can always lay the foundation for the impeachment of a witness against his client, even if the impeachment questions be pregnant with accusation of crime against the witness or a party to the action. ▉ But, in this instance, while the conduct of counsel for the defendants in reviving before the jury a scandal involving an attack upon the personal character of counsel for the plaintiffs which had long been relegated to a forgotten past was highly improper, and, indeed, reprehensible, yet the record shows that the attack was in no small measure invited by counsel for the plaintiffs himself, not alone in the challenge he issued to counsel for the defendants, but also in that he charged the latter with attempting by cross-examination to make Miss Blane falsify her testimony and further charged that the basic foundation of a certain question propounded by defendants' counsel to that plaintiff involved the statement of a falsehood. But the whole matter was grossly improper and so far removed from any pertinency to the case or its issues and so far in contravention of the decorum which should uniformly be maintained in courts of justice that it should have been stopped by the court at the very inception thereof. If the verdicts were resting upon a narrow evidentiary margin, we would be compelled to send the cases back for a retrial for the misconduct assigned and as above explained. But eliminat-

ing from consideration the testimony of Seaich, testifying for the defense, and the admission by Walters to defendant Evick (denied by Walters, it is true) that they (plaintiffs) were to blame for the accident, the testimony of the plaintiffs and of Johnson and certain other of their witnesses would stand as a sufficient support to the verdicts. In fact, considering all the testimony together or as a whole, it is plainly manifest that no other verdicts than those returned could have justly been reported by the jury. It is, therefore, perfectly clear that no miscarriage of justice resulted from the misconduct referred to.

█ The complaint that certain instructions embraced within the court's charge to the jury contained erroneous statements of the law cannot be reviewed for the reason that it is not shown by the record by whose request said instructions were given—whether at the request of the plaintiffs or of the defendant, the presumption in such case being "that they were given at the request of the" appellants' counsel. (*Gray* v. *Eschen*, 125 Cal. 1, 5 [57 Pac. 664]; *Sutter-Butte Canal Co.* v. *American Rice & Alfalfa Co.*, 182 Cal. 549, 553, 554 [189 Pac. 277]; *Bognuda* v. *Pearson*, 71 Cal. App. 105 [234 Pac. 857]; *Finkelstein* v. *Cosgrove*, 83 Cal. App. 201 [256 Pac. 608]; *Murray* v. *Kunde*, 91 Cal. App. 440 [267 Pac. 158].) The reason of this rule is lucidly explained in *Gray* v. *Eschen, supra*. We have, however, read the court's charge and thus have found that it covered every principle of law applicable to the issues.

█ The disallowance of certain instructions proposed by the plaintiffs and rejected by the court, upon the question of negligence, did not constitute error. They failed to take into consideration the proposition that, even if the evidence was such as to show that the driver of the cab was negligent in such driving, the plaintiffs could not recover if the evidence also showed that they themselves were guilty of negligence which contributed proximately or directly to the injuries they received. Said instructions merely stated that if the operator of the car was guilty of negligence in operating it at the time of the accident then the plaintiffs would be entitled to recover. █ Among the instructions, however, proposed by the plaintiffs and disallowed by the court was one based upon and in the language of the

following provision of section 134 of the State Vehicle Act (Stats. 1923, p. 533 et seq.):

"In passing any railroad, interurban or street car while passengers are alighting from or boarding the same, vehicles shall be operated or driven on the right-hand side of such cars and at a rate of speed not exceeding ten miles an hour, and no portion thereof or of any load thereon shall come within six feet of the running board or steps of such cars, and shall at all times be operated with due care and caution so that the safety of such passengers shall be assured."

It is plainly apparent from its very language that section 134 of the Vehicle Act, upon which the instruction referred to was based, has application entirely to vehicles traveling in the same direction in which such street-car is traveling and not to vehicles traveling in the opposite direction to that in which such car is going. Manifestly, the instruction was wholly inapplicable to the facts of the present case.

The judgment in the case of *George Walters* v. *E. M. Evick and E. M. Evick, etc.,* is hereby affirmed, and the judgment in the case of *Lottie Blane* v. *E. M. Evick and E. M. Evick, etc.,* is hereby affirmed.

Bartlett, J., *pro tem.,* and Plummer, J., concurred.